IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| MARTY D. DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:22-cv-84 |
| | ) | JURY DEMANDED |
| ARCONIC CORPORATION and ARCONIC TENNESSEE LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

COMES the Plaintiff, Marty D. Davis ("Mr. Davis"), and sues Arconic Corporation and Arconic Tennessee LLC and respectfully shows this Honorable Court as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      Mr. Davis is an adult citizen and resident of Cumberland County, Tennessee.

2.      Arconic Corporation is a Delaware corporation registered to do business in the State of Tennessee. Arconic's principal office is located at 201 Isabella St., Pittsburgh, PA 15212.[1]

3.      Arconic Tennessee LLC ("Arconic") is a Delaware limited liability company registered to do business in the State of Tennessee. Arconic is a wholly owned subsidiary of Arconic Corporation. Its principal office located in 201 Isabella St., Pittsburgh, PA 15212.

4.      Arconic Corporation operates its "Tennessee Operations" at 2300 North Wright Road Alcoa, TN 37701 in Blount County, Tennessee. Arconic's Tennessee Operations include

---

[1] It is noteworthy that counsel for Arconic Tennessee LLC responded on behalf of Arconic Corporation and Arconic Tennessee LLC during the Equal Employment Opportunity Commission administrative process.

several locations at or around 2300 North Wright Road, Alcoa, TN 37701 in Blount County, Tennessee.

5.     Arconic Tennessee LLC operates at 1100 East Hunt Road, Alcoa, TN 37701 in Blount County, Tennessee. Arconic's Tennessee LLC Operations include several locations at or around 1100 East Hunt Road, Alcoa, TN 37701, including a location at 300 North Hall Road, Alcoa, TN 37701 in Blount County, Tennessee.

6.     At all relevant times, Mr. Davis was employed by Arconic and worked for Arconic's locations in Blount County, Tennessee.

7.     This action arises from Arconic's unlawful conduct, as described more fully herein, for discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), which clearly prohibits employment discrimination based on race, sex, and religion, and for discrimination and retaliation in violation of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, et. seq. ("THRA"), which makes it illegal for a Tennessee employer to discriminate against their employees based on their race, sex, or religion.

8.     The matter in controversy involves questions of federal law, giving this Court original jurisdiction of this action pursuant to the provisions of 28 U.S.C. § 1331.[2]

9.     The matter in controversy also involves ancillary claims that form part of the same case and controversy as that claim which is within the original jurisdiction of the Court. This Court has supplemental jurisdiction of such ancillary claims pursuant to the provisions of 28 U.S.C. §1367.

---

[2] Jurisdiction also exists pursuant to 28 U.S.C. § 1332, based on Mr. Davis's Tennessee residence, Arconic's Pennsylvania-based principal place of business, and the amount in controversy exceeding $75,000.00.

10.     Venue is proper with this Court pursuant to 28 U.S.C. §§123(a)(2) and 1391, and 42 U.S.C. §§ 2000e-5(f)(3). Specifically, the unlawful employment practices by Arconic were committed within the jurisdiction for the Eastern District of Tennessee at Knoxville, that being Blount County, Tennessee.

11.     Mr. Davis filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") office, received a Notice of Rights on December 10, 2021, and exhausted all of his administrative remedies. *See* Notice of Right to Sue attached hereto as **EXHIBIT A**. Moreover, Mr. Davis has timely filed this suit within the prescribed period allowed by the Notice of Right to Sue.

## FACTUAL ALLEGATIONS

12.     This case stems from Arconic's actions surrounding the termination of Mr. Davis on or around May 17, 2021.

13.     Arconic employs at least fifteen (15) employees and as such, is an employer covered under Title VII.

14.     Mr. Davis has been employed with Arconic since on or around July 17, 2006. [3] His most recent period of employment with Arconic was from August 2020 until he was fired in May 2021.

15.     In response to the Covid-19 pandemic, Mr. Davis was placed on curtailment by Arconic from April 6, 2020, to August 16, 2020.

16.     While on curtailment, in part due to being laid off, in part due to the global Covid-19 pandemic, Mr. Davis renewed his Christian faith.

---

[3] Mr. Davis was hired when the entity now known as Arconic was then called Alcoa Aluminum or Alcoa Inc. Mr. Davis was laid off from Alcoa Inc. in 2009 and rehired in January 2012.

3

17.     Specifically, Mr. Davis became a member of the Living Church of God.

18.     Members of the Living Church of God hold dear certain fundamental beliefs, one of which is adherence to the Fourth Commandment, strict observance of the Sabbath day, which calls on followers to cease from work to reflect on the day as the day of rest, worship, and ministry in harmony with the teachings and practice of Jesus.

19.     During his curtailment, Mr. Davis faithfully began keeping the Sabbath every Friday at sundown to Saturday at sundown, while also attending[4] church services at his local Living Church of God congregation every Saturday.[5] Observation of the Sabbath is a key tenet of Mr. Davis's religion as a member of the Living Church of God.

20.     Upon resuming his employment with Arconic in August, Mr. Davis was working a Monday through Friday schedule, approximately 5:45 AM until 2:00 PM.

21.     At some point after resuming with Arconic, Mr. Davis had heard rumors that his department, North Ingot, would be switching to a seven-day-a-week schedule.

22.     After hearing the news of the impending schedule change, Mr. Davis immediately applied for a religious accommodation so that he could continue to observe the Sabbath.

23.     On or around September 18, 2020, Mr. Davis filed the appropriate religious accommodation paperwork with his immediate supervisor, Darren Saddler, and with Kendra Daniels in Human Resources.

24.     At all times relevant to this action, Arconic employed Darren Saddler and Kendra Daniels and their actions are those of Arconic pursuant to general principles of agency.

---

[4] Mr. Davis occasionally teaches sermonettes at his congregation.

[5] Mr. Davis's schedule prior to curtailment would not have allowed for Mr. Davis to keep the Sabbath or attend these Saturday services.

4

25.     If Darren Saddler and Kendra Daniels had not previously been aware of Mr. Davis's religious beliefs prior to September 18, 2020, they, as of that date, were now in full awareness of Mr. Davis's sincerely held religious beliefs.

26.     In his request, Mr. Davis asked that he be allowed off of work on his Sabbath[6] so that he would not be in violation of his religious beliefs.

27.     Of note, Mr. Davis did not receive a response regarding this accommodation for two (2) months.[7]

28.     Although Arconic did not respond to Mr. Davis's accommodation request in a timely fashion prior to North Ingot's scheduling changing, Mr. Davis felt obligated to not work the Saturdays that he was scheduled to work so that he could observe his Sabbath.

29.     Consequently, Mr. Davis incurred approximately six (6) absences as a result of him taking off to observe the Sabbath.

30.     Because of Mr. Davis's absences, Arconic supervisor David Newman informed Mr. Davis that he would be given ten (10) days suspension subject to termination for having missed the six (6) days.

31.     David Newman ("Mr. Newman"), was a supervisor of the North Ingot department located at North Plant within Arconic's Tennessee Operations. He subsequently was the supervisor of the Trim Line department for Arconic's Tennessee Operations.

32.     At all times relevant to this action, Arconic employed Mr. Newman and his actions are those of Arconic pursuant to general principles of agency.

---

[6] Friday at sundown until Saturday at sundown.

[7] It is important to note the fact that this had not been a prior issue as Mr. Davis was not originally scheduled to work on prior Sabbaths. Thus, Mr. Davis requesting this accommodation was him being proactive to protect his religious beliefs when the schedule did in fact change and those in North Ingot were going to be required to work seven (7) days a week.

5

33.     Mr. Newman became aware of Mr. Davis's religious beliefs in or around August/September of 2020. He became aware of Mr. Davis's gender and race upon meeting him in years prior to 2020.

34.     On October 21, 2020, although not in agreeance with the punishment, Mr. Davis signed a disciplinary action record related to his six (6) Sabbath-related absences, therefore, succumbing to the ten (10) day suspension.

35.     On the first evening of Mr. Davis's suspension, David Christopher ("Mr. Christopher"), Mr. Davis's union representative, called Mr. Davis and explained to Mr. Davis that he was to report to work the next morning and that he would receive restitution for his discipline-related absence.

36.     Mr. Christopher indicated that Arconic had made a mistake in disciplining Mr. Davis for his religion-related absences.

37.     As time went on, Mr. Davis continued to accrue absences because of his keeping of the Sabbath. He accumulated approximately five (5) or six (6) more absences as a result.

38.     Mr. Davis had still not heard anything from Arconic's Human Resource department regarding the accommodation request that he submitted on or around September 18, 2020.

39.     Mr. Davis called Shannon Zartman ("Ms. Zartman") of Human Resources, to explain the situation to her and belabored the fact that Human Resources was going to give him new occurrences for taking off for the Sabbath unless Arconic gave him an accommodation.

40.     Ms. Zartman stated that she would "look into it" and would call Mr. Davis back before the end of day. She further advised Mr. Davis to take the upcoming Sabbath and said

that Human Resources and the union would have a meeting to find out how this situation would be handled.

41.     At all times relevant to this action, Arconic employed Ms. Zartman and her actions are those of Arconic pursuant to general principles of agency.

42.     Ms. Zartman became aware of Mr. Davis's religious beliefs in or around November of 2020, if not earlier. She also became aware of Mr. Davis's gender and race throughout the accommodation process.

43.     The first meeting regarding Mr. Davis's accommodation occurred in North Ingot on November 10, 2020. Present were Lauren Lynch, Mike Everett (a union representative and head of North Plant (the location of North Ingot)), Mr. Christopher, and James Harrison. Mr. Davis was not present at this meeting.

44.     During the meeting on November 10, 2020, head of Human Resources, James Harrison, admitted that he had not even read the email regarding Mr. Davis's request for religious accommodation; a request which entailed making Saturday a standard leave of absence for Mr. Davis so that he may observe the Sabbath.

45.     The next meeting regarding Mr. Davis's accommodation occurred on November 13, 2020. Mike Everett, Mr. Christopher, Brian Newman, Lauren Lynch, and Mr. Davis were present.

46.     During the November 13, 2020 meeting, Mr. Davis's absences had been reduced to one and one half (1.5) occurrences due to the fact that all of his prior absences had been Sabbath day-related. These dates were excused from the date that he submitted the accommodation on September 18, 2020 through November 13, 2020.

47.     During the November 13, 2020 meeting, it was demanded that Arconic give a formal answer regarding Mr. Davis's accommodation request. Arconic Human Resources

representative Lauren Lynch's response was, "We have an answer, but we aren't going to give it at this time."

48.     In other words, Arconic was "hiding the ball" by refusing to state whether Mr. Davis's religious accommodation request was going to be granted by leaving the status of the request ambiguous. Specifically, in these meetings, Arconic's Human Resources representatives refused to offer or entertain any other alternatives for accommodating Mr. Davis's religion as part of the reasonable accommodation interactive process. For example, Arconic was not the driving force behind transferring Mr. Davis to a new department; Mr. Davis took it upon himself to initiate such transfer.

49.     Even if Arconic had suggested that Mr. Davis transfer departments, this was not a special recommendation/accommodation for Mr. Davis. This option is detailed in Arconic's policies as an alternative to having to provide an employee a shift/scheduling accommodation.[8]

50.     In November of 2020, Mr. Christopher informed Mr. Davis that Chuck Brown ("Mr. Brown"), superintendent of North Ingot, was transferring to the Trim Line department. Further, Mr. Brown told Mr. Christopher that the shifts in Trim Line would be Monday through Friday.

51.     In response, Mr. Davis and Mr. Christopher discussed the possibility of Mr. Davis transferring to Trim Line in order to cease the need for the accommodation.

52.     Based on Mr. Brown's assertions regarding the anticipated Monday through Friday shifts, Mr. Davis made the decision to put in for a transfer to Trimline.

---

[8] However, had Arconic offered this option, the situation likely would have resolved itself at that point.

8

53.     Mr. Brown was a supervisor of the North Ingot department located at North Plant within Arconic's Tennessee Operations. He subsequently was the supervisor of the Trim Line department for Arconic's Tennessee Operations.

54.     At all times relevant to this action, Arconic employed Mr. Brown and his actions are those of Arconic pursuant to general principles of agency.

55.     Mr. Brown became aware of Mr. Davis's religious beliefs in or around August/September of 2020. He became aware of Mr. Davis's gender and race upon meeting him in years prior to 2020.

56.     Mr. Brown routinely performed retaliatory actions against Mr. Davis after he filed for his religious accommodation, Specifically, Mr. Brown repeatedly and constantly harassed Mr. Davis in a way that was severe and pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, and/or abusive.

57.     Mr. Davis's first day in the Trim Line department was November 16, 2020.

58.     When Mr. Davis transferred, he took a significant decrease in pay and lost eight (8) years of seniority. Mr. Davis took this action of transferring to a different department in the hope that he would be able to keep a schedule that allowed him to observe the Sabbath day accommodation-free.

59.     After working in Trim Line for a couple of weeks, Mr. Brown informed Mr. Davis that Trim Line would be switching to seven (7) days a week starting in January 2021. However, this transition began in November 2020 with twelve-hour shifts that included some Saturdays.

60.     On December 14, 2020, Mr. Davis had a follow-up conference call with Ms. Zartman, Mr. Brown, Mike Everett, Mike Mostella, and Mr. Christopher.

61. Ms. Zartman began the December 14, 2020 meeting by stating that because Mr. Davis had transferred to another department, his request for an accommodation needed to be reviewed.

62. Ms. Zartman stated that Mr. Davis had worked with Lauren Lynch regarding the accommodation in North Ingot, but that she, herself, was not familiar with the situation and neither was Chuck Brown or Mike Mostella; therefore, a review was needed.

63. Ms. Zartman further stated that Arconic would need to respond to the accommodation from the Trim Line department's perspective.

64. Ms. Zartman followed by asking Mr. Davis to clarify information on the accommodation that he had originally filed and asked questions about the Sabbath itself.

65. Ms. Zartman then asked Mr. Brown for clarification on how the Trim Line schedule would be changing in the following weeks.

66. Mr. Brown indicated that Trim Line was going from an eight-hour, five-day workweek to a twelve-hour workday, five (5) days a week. Mr. Brown continued by stating that Trim Line would be on a seven-day schedule starting in January 2021.

67. Ms. Zartman then asked Mr. Davis if the upcoming seven-day schedules for the next two (2) weeks would work for him; he responded in the negative.

68. Mr. Davis reiterated that his reason for transferring to Trim Line in the first place was a result of North Ingot's, as well as many other department's, seven-day schedules not working with regard to the Sabbath day.

69. Ms. Zartman then asked who had told Mr. Davis that the schedule in Trim Line would be five (5) days a week, to which Mr. Davis indicated that Mr. Brown, himself, had said this.

10

70.     Mr. Brown deflected and responded by saying that Trim Line was originally five (5) days a week, but that volume had caused it to "ramp up quickly" and that it "changes every week."

71.     Ms. Zartman then asked if Mr. Davis's religion allowed for any alternate days off; Mr. Davis again responded in the negative.

72.     At no time was Mr. Davis told that Trim Line would definitively be transferring to a seven (7) day a week schedule.

73.     During the same December 14, 2020 meeting, Mr. Brown asked Mr. Davis why, given all the years that Mr. Davis had worked for Arconic and all the Sabbaths that he had worked before, that Mr. Davis was only now asking for an accommodation. In other words, Arconic, through Mr. Brown, was questioning Mr. Davis's sincerely held religious beliefs.

74.      Mr. Davis informed Mr. Brown, and everyone present, that during his curtailment he had renewed his Christian faith and as part of that, began, and must continue, keeping the Sabbath.

75.     Mr. Davis further detailed that transfer to the Trim Line department was his offer and attempt to resolve the situation while avoiding the need to proceed with the accommodation process. Mr. Davis told Arconic's agents that when he made the decision to transfer departments, he had not been informed that Trim Line would be switching to seven (7) day a week shifts.

76.     Mr. Brown, seemingly contrary to his position earlier in the meeting, emphatically denied having told Mr. Davis that Trim Line's schedule would be eight (8) hours a day, five (5) days a week, Monday through Friday.

77.     Mr. Brown denied knowing that Mr. Davis had any intent to transfer to Trimline until Mr. Brown received the transfer/bid.

78.     Mr. Christopher refuted this by stating that Mr. Brown did, in fact, say in Mr. Davis's presence, that the Trim Line's schedule would be Monday through Friday prior to Mr. Davis having requested a transfer.

79.     Further, Mr. Christopher declared that he specifically asked Mr. Brown that question in front of Mr. Davis to confirm whether the Trim Line shift would allow Mr. Davis to avoid any scheduling conflict by having to work on the Sabbath.

80.     When Mr. Davis learned of the accommodating schedule available within the Trim Line department from Mr. Brown, Mr. Davis expressed in the presence of both Mr. Christopher and Mr. Brown that Mr. Davis would put in for a transfer to Trim Line.

81.     Prior to the transfer being put into motion, Mr. Brown was well aware of Mr. Davis's intention to transfer to Trim Line, as well as his need for an accommodation.

82.     The December 14, 2020 meeting continued by Ms. Zartman stating that schedules are subject to change, even after transfers, and that accommodation requests need to be reviewed once someone transfers to any new department.

83.     To this, Mr. Christopher followed by stating that Mr. Davis had multiple transfers in for different departments that would offer him a Monday through Friday option and that he moved to Trim Line because he believed that he would be working Mondays through Fridays based on Mr. Brown's previous statements.

84.     Mr. Davis then added that he had received a call-back to work in Trim Line after his curtailment ended, but that he had specifically declined that offer because that department was not working a Monday through Friday shift at that time and because moving to that department would have caused him to lose seniority.

85.     Mr. Davis followed by mentioning the option of being able to transfer to the storeroom if Arconic was not going to be able to accommodate him. Mr. Brown, voicing

Arconic's position, responded to this by saying, "The problem with the storeroom bid is that you're here (Trim Line) a year now since you bid here. You're stuck here (Trim Line) for a year. You can't bid out."

86.     Mr. Davis quickly replied that had he known about the impending change in schedule for Trim Line, he would have stayed at North Ingot because he was being accommodated by Arconic at that point, and that his absences for observing the Sabbath were not being counted as occurrences.

87.     Mr. Christopher concurred that Human Resources had excused Mr. Davis's Sabbath-related absences.

88.     Mr. Brown's sole comment to this was, "That's the dumbest shit I ever heard in my life."

89.     Ms. Zartman again stated, "Now that Marty has changed departments and the department is working extended shifts and hours that go into this request that Marty has in place . . . the Trim Line is a new department with different needs, and so we need to review Marty's request for accommodation, and they (Trim Line) need to see if they can accommodate it or not."

90.     Mike Everett then asked for clarification as to whether Arconic's Human Resources would accommodate Mr. Davis by not counting Sabbath-related absences against him in the interim until they made their decision, since this was how they proceeded while Mr. Davis was in North Ingot.

91.     Ms. Zartman stated that this would continue to be the case but that "[she and Arconic] would attempt to get [Mr. Davis] an answer as quickly as possible." Mr. Brown chimed in by stating, "It won't be drug out as long as it was [in North Ingot], Mike. I promise you that."

92.     Immediately after the December 14, 2020 meeting, during a private discussion in Mr. Brown's office with Mr. Brown, Mr. Christopher, and Mr. Davis, Mr. Brown stated that Arconic's attorney had told Human Resources to give Mr. Davis his accommodation, and that because the attorney believed such was a proper accommodation, the attorney "must have gotten his degree from a Cracker Jack box."

93.     The next meeting regarding Mr. Davis's accommodation occurred on December 17, 2020, and was attended by Ms. Zartman, Mike Mostella, Mr. Christopher, Mr. Brown, Mike Everett, and Mr. Davis.

94.     During this meeting, it was determined that Mr. Davis would be accommodated as follows: since Trim Line had switched to twelve (12) hour days (6:00AM – 6:00PM), Mr. Davis would be allowed to leave one (1) hour early on Fridays.

95.     At this meeting, Mr. Brown reaffirmed from the prior meeting that the following week would be a Monday through Thursday, twelve-hour shift, and then twelve (12) hours on Saturday (to accommodate for Christmas). Mr. Brown went on by detailing that the start of January would mark the beginning of the seven-day drop and that weekends would be required.

96.     As such, Mr. Brown directed that Mr. Davis would be required to swap shifts with another employee when he was scheduled for Saturdays and that if he could not find someone to swap shifts with him, then Arconic could not accommodate his request.

97.     Ms. Zartman stated that, "Failure to find someone to swap shifts would result in [Arconic] not being able to accommodate [the request]." She further stated, "We cannot accommodate a regular request for Saturdays off."

98.     Mr. Davis would note that this does not constitute an accommodation under Arconic's policies.

99.     Specifically, Arconic has a policy that an employee can switch any shift as long as someone is willing to cover it.

100.    Arconic stating that such an action is an "accommodation" for Mr. Davis's religious beliefs is simply not true; Arconic did nothing in response to Mr. Davis's accommodation request.

101.    Mr. Davis did not agree to this "proposed accommodation." Mr. Davis was not given the option to agree, or the opportunity to consider or explore other alternatives, this was simply what Mr. Davis was directed to do.

102.    Mr. Davis had moral and religious objections to this "proposed accommodation." Because of the strict observance of the Sabbath day, Mr. Davis was not at liberty to ask anyone to cover any Saturday shift for which he may have been scheduled.

103.    Specifically, Mr. Davis abides by the religious principles found in chapter Exodus 20:8 of the Bible, wherein it directs that he may not request/induce someone to work on the Sabbath as God has forbidden such.

104.    Therefore, Mr. Davis would be acting against his religious beliefs to ask someone to work on the Sabbath, and that is why Mr. Davis would NOT have agreed to such arrangement had Arconic given him the opportunity to share his mind on this proposed accommodation.[9]

105.    As such, Mr. Davis followed his religious beliefs by not working on the Sabbath and not requesting others to do so in his stead. This is what resulted in the numerous occurrences accumulated by Mr. Davis, which ultimately led to Arconic's termination of Mr. Davis's employment.

---

[9] Mr. Davis even shared this belief with Arconic employee Ian McGhee.

15

106. Again, asking an employee to violate his firmly held religious beliefs is not an accommodation.

107. Giving an employee an ultimatum which would force him to violate his religious beliefs, rather than working through the interactive process and coming up with a solution that works, is not an accommodation.

108. Arconic could have allowed for Mr. Davis to transfer to another department that would not require an accommodation.

109. In fact, Mr. Davis expressly requested to be transferred either to a new department where he would not need an accommodation, or back to North Ingot so that he could receive his previous accommodation.

110. Allowing Mr. Davis to transfer a second time would not have caused an undue burden on Arconic.

111. Moreover, Arconic could have waived any policy that it has stating that an employee has to be in a department one (1) year before they can transfer.

112. Even had this policy been a Collective Bargaining Agreement term, Mr. Davis's union agreed to allow Mr. Davis to transfer again.

113. In other words, Arconic could have accommodated Mr. Davis in a way that did not pose an undue burden to itself; yet, it failed to do so, and instead, chose to terminate Mr. Davis for following his sincerely held religious beliefs.

114. No other conclusion can be reached but that Arconic failed to accommodate Mr. Davis.

115. Not only did Arconic fail to accommodate Mr. Davis, but Arconic chose to accommodate an individual who was a different race and gender from Mr. Davis, and who had not made a request for a reasonable religious accommodation.

116.    Specifically, a black female employee was allowed to transfer departments twice within a one (1) year period.

117.    Contrary to Arconic's most recent position, it does not matter whether Arconic made a "mistake" in allowing this individual to transfer, what matters is that Arconic allowed for a minority, female, that had not requested a religious accommodation, to transfer after being in a department for less than one (1) year period set forth by Arconic simply because she was unhappy.

118.    Moreover, Arconic allowed this minority female employee to transfer back to her prior department in violation of the one (1) year time period without any repercussion, as well as transfer into a position of higher pay.

119.    However, Mr. Davis, a white male, was discriminated and retaliated against by not being allowed to transfer and/or obtain reasonable accommodations for valid religious beliefs.

120.    Moreover, allowing Mr. Davis to transfer back to his home department, North Ingot, would have given him the opportunity to bid on multiple Monday through Friday positions that were then available in that area.

121.    Arconic should have allowed Mr. Davis to transfer just as it did a minority female that had not made a religious accommodation request.

122.    Any alleged mistake on Arconic's behalf is not Mr. Davis's fault; Arconic set the precedent, and it discriminated against Mr. Davis by not allowing the same treatment.

123.    In summary, Mr. Davis was never told in any fashion that accommodating his Sabbath would create "an undue hardship" on Arconic.

124. Mr. Davis was simply told that the burden was on him to arrange his replacement, or he would receive penalties for any Sabbaths for which he did not work, even though it was against his beliefs to ask of such from another.

125. When Mr. Davis sought an alternative that would not further violate his religious beliefs, he was denied such alternatives, and Arconic expressed no flexibility in accommodating Mr. Davis's ability to keep his strict religious belief to honor the Sabbath day.

126. Arconic failed to show that Mr. Davis's proposed accommodation of transferring either back to North Ingot, or to another department, such as storeroom, would cause an undue hardship upon Arconic.

127. Transferring an employee is a form of reasonable accommodation, even when pay or benefits terms may change, and allowing such would have been a perfectly acceptable accommodation for Mr. Davis.

128. However, Arconic completely refused to consider a transfer, even though Mr. Davis's union was willing to waive any supposed one-year requirement.

129. Moreover, Arconic stated nothing more than a "speculative" or "hypothetical hardship" when Mr. Davis brought up transferring.

130. Ultimately, Mr. Davis was terminated because Arconic failed to reasonably accommodate his religious beliefs, and in turn, counted every Sabbath that he took as an absence, thus, finding him in violation of Arconic's attendance policy.

131. Mr. Davis was discriminated against because of his religious beliefs, and was treated differently from a minority female, who also requested a transfer within the period "allowed" by Arconic.

132. Based on Arconic's actions, Mr. Davis was discriminated against by Arconic due to his religious beliefs, race, and gender and was subsequently retaliated against due to

requesting a reasonable accommodation for his religious beliefs, as well as reporting Arconic's discriminatory actions via union representation.

133. Moreover, Arconic failed to provide Mr. Davis with a reasonable accommodation due to his religious beliefs.

134. Arconic knew or should have known that its actions as alleged herein were prohibited by Title VII, as well as various Tennessee state laws.

<u>CAUSES OF ACTION</u>

<u>Count One</u>

<u>Religious Discrimination Under Title VII</u>

135. Mr. Davis incorporates and re-alleges the foregoing allegations as if fully set forth herein.

136. Since at least May 2021, the Defendant has engaged in unlawful employment practices in violation of Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e2(a)(1)[10] by failing or refusing to reasonably accommodate the religious beliefs of Mr. Davis.

137. Mr. Davis is a member of a protected class via religion.

138. Specifically, Mr. Davis is a member of the Living Church of God.

139. Mr. Davis has a sincerely held religious belief that he cannot work on the Sabbath which begins at sundown on Fridays and continues until sundown on Saturdays.

140. This sincerely held religious belief also prohibits Mr. Davis from asking others to work for him on the Sabbath.

141. Mr. Davis notified Arconic of his prohibition against working on his Sabbath.

---

[10] *See also* 29 CFR § 1605.2

142.    Although Arconic originally punished Mr. Davis for absences on his Sabbath, Arconic eventually approved Mr. Davis's request for accommodation of his religious beliefs and did not count absences against Mr. Davis that occurred because of his Sabbath. This accommodation lasted for a few months in 2020.

143.    During the months that Arconic honored Mr. Davis's accommodation, Mr. Davis performed successfully in his position.

144.    On or about December 17, 2020, Mr. Davis was notified by his supervisor, as well as Human Resources, that Arconic would no longer be able to accommodate his religious belief against working on his Sabbath.

145.    Arconic did not state that it was denying his request for accommodation based on undue hardship, but only that he would be required to resolve his need for an accommodation.

146.    Mr. Davis honored his religious obligation and called-out on every Saturday shift that he was scheduled to work following the revocation of his accommodation.

147.    The only "accommodation" that Arconic provided Mr. Davis was for him to find volunteers to swap shifts with him every Sabbath.

148.    Sixth Circuit precedent holds that "where an employee sincerely believes that working [on the Sabbath] is morally wrong and that it is a sin to try to induce another to work in his stead, then an employer's attempt to accommodate that requires the employee to seek his own replacement is not reasonable."

149.    Mr. Davis made it known that it is against his religious beliefs to induce others to work on the Sabbath in his stead.

150.    Arconic refused to reasonably accommodate the religious beliefs of Mr. Davis by requiring that he work on the Sabbath.

151. , because Arconic requested Mr. Davis violate his own religious beliefs by requiring him to seek his own shift replacements, the "accommodation" provided was not a reasonable accommodation.

152. Ultimately, because of their failure to accommodate him, Arconic terminated Mr. Davis's employment on May 18, 2021.

153. Based on the circumstances, the only reasonable accommodations available were the options proposed by Mr. Davis: to give Mr. Davis Friday at sunset to Saturday at sunset off, with no contingencies; to allow him to transfer back to his old department, North Ingot, and resume his prior accommodation; or to allow him transfer to a new department (by aligning with past practices[11] and/or providing an exception to the transfer "policy"). None of these options would cause an undue burden on Arconic.[12]

154. Mr. Davis was denied a reasonable accommodation of his religious beliefs and discharged by Arconic as a result .

155. The unlawful employment practices complained of above were intentional.

156. The unlawful employment practices complained of above were done with malice or with reckless indifference to the federally protected rights of Mr. Davis.

157. Based on the allegations herein, Mr. Davis was discriminated against by Arconic.

---

[11] Not only is Mr. Davis alluding to other discriminatory actions from the instant case, but also to the fact that Arconic's predecessor regularly allowed for religious accommodations from 2011 to 2015, or in other words, the company quit complying with federal law when Arconic purchased Alcoa, Inc.

[12] "The employee should be accommodated in his or her current position if doing so does not pose an undue hardship. If no such accommodation is possible, the employer needs to consider whether lateral transfer is a possible accommodation." "[T]he mere existence of a seniority system or CBA does not relieve the employer of the duty to attempt reasonable accommodation of its employees' religious practices."

158.     As a direct and proximate result of Arconic's unlawful, discriminatory, and harassing conduct against Mr. Davis, and as a direct and proximate result of the violations of Mr. Davis's federally protected rights, Mr. Davis has suffered harm, including but not limited to lost wages, benefits, and damage to his reputation, and emotional distress.

159.     Because of this harm, Mr. Davis is entitled to damages from Arconic.

## Count Two

## Religious Reprisal/Retaliation Under Title VII

160.     Mr. Davis incorporates and re-alleges the fore going allegations as if fully set forth herein.

161.     Mr. Davis is a member of a protected class via religion. Specifically, Mr. Davis is a member of the Living Church of God.

162.     Mr. Davis engaged in a protected activity, including that he objected to being discriminated against due to his religion, opposed unlawful practices of Arconic, and requested a reasonable accommodation in light of his sincerely held religious beliefs.

163.     Arconic was aware of Mr. Davis's protected activities.

164.     Arconic, through its agents, representatives, and employees, intentionally, willfully, and knowingly took adverse action or created a hostile work environment due to Mr. Davis engaging in protected activities (protesting and opposing unlawful practices) which affected the terms and conditions of Mr. Davis's employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et. seq.

165.     Arconic through its agents, representatives, and employees, engaged in actions and omissions constituting retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et. seq.

166.     Arconic took adverse actions against Mr. Davis by terminating him due to the fact that he opposed a practice made unlawful under Title VII and engaged in activity protected by Title VII, such that a reasonable employee would have found the actions materially adverse, and which would dissuade a reasonable employee from making such an accommodation request to upper management, home office, or human resources at Arconic.

167.     There was a causal connection between the exercise by Mr. Davis of such rights and protected activity and the adverse actions against him.

168.     As a direct and proximate result of Arconic's unlawful retaliatory conduct against Mr. Davis, and as a direct and proximate result of the violations of Mr. Davis's federally protected rights, Mr. Davis has suffered harm, including but not limited to lost wages, benefits, and damage to his reputation, and emotional distress.

169.     Because of this harm, Mr. Davis is entitled to damages from Arconic.

<u>Count Three</u>

<u>Gender Discrimination Under Title VII</u>

170.     Mr. Davis incorporates and re-alleges the foregoing allegations as if fully set forth herein.

171.     Mr. Davis is a member of a protected class via sex/gender.

172.     Mr. Davis suffered an adverse employment action by not being allowed to transfer departments and, subsequently, being terminated by Arconic.

173.     Mr. Davis was qualified for his position as he had worked for Arconic, or its predecessor, for the last fifteen (15) years and is generally regarded as an exceptional employee.

174.     Arconic treated Mr. Davis differently from similarly situated individuals outside of his protected class by treating him differently than Arconic treated a female who also requested for a transfer within one (1) year of being in a department.

175.     Specifically, the female was allowed to transfer within the one (1) year "prohibited" transfer period; however, Mr. Davis was not allowed a similar transfer.

176.     Based on the allegations herein, Mr. Davis was discriminated against by Arconic.

177.     Because Mr. Davis was discriminated against, he is entitled to damages from Arconic.

<u>Count Four</u>

Race Discrimination Under Title VII

178.     Mr. Davis incorporates and re-alleges the foregoing allegations as if fully set forth herein.

179.     Mr. Davis is a member of a protected class via race.

180.     Mr. Davis suffered an adverse employment action by not being allowed to transfer departments and, subsequently, being terminated by Arconic.

181.     Mr. Davis was qualified for his position as he has worked for Arconic, or its predecessor, for the last fifteen (15) years and is generally regarded as an exceptional employee.

182.     Arconic treated Mr. Davis differently from similarly situated individuals outside of his protected class by treating him differently than Arconic treated a minority who also requested for a transfer within one (1) year of being in a department.

183.     Specifically, the black minority was allowed to transfer within the one (1) year "prohibited" transfer period; however, Mr. Davis was not allowed a similar transfer.

184. Based on the allegations herein, Mr. Davis was discriminated against by Arconic.

185. Because Mr. Davis was discriminated against, he is entitled to damages from Arconic.

## Count Five

## Religious Discrimination Under THRA

186. Mr. Davis incorporates and re-alleges the foregoing allegations as if fully set forth herein.

187. Since at least May 2021, the Defendant has engaged in unlawful employment practices in violation of Tenn. Code Ann. § 4-21-401 by failing or refusing to reasonably accommodate the religious beliefs of Mr. Davis.

188. Mr. Davis is a member of a protected class via religion. Specifically, Mr. Davis is a member of the Living Church of God.

189. Mr. Davis has a sincerely held religious belief that he cannot work on the Sabbath, from sundown on Friday to sundown on Saturday. This sincerely held religious belief also prohibits him from asking others to work for him on the Sabbath.

190. Mr. Davis notified Arconic of his religious prohibition to working on the Sabbath.

191. Although Arconic originally punished Mr. Davis for absences which occurred on the Sabbath, Arconic eventually approved Mr. Davis's request for accommodation of his religious beliefs and did not count absences against Mr. Davis that occurred due to his observance of the Sabbath. Arconic honored this accommodation for a few months in 2020.

192. During the months that Arconic honored Mr. Davis's accommodation, Mr. Davis performed successfully in his position.

193. On or about December 17, 2020, Mr. Davis was notified by his supervisor, as well as Human Resources, that Arconic would no longer be able to accommodate his religious prohibition against working on the Sabbath.

194. Arconic did not state that it was denying his request for accommodation based on undue hardship, but only that he would be required to resolve his need for an accommodation.

195. Mr. Davis honored his religious obligation and called-out on every Saturday shift for which he was scheduled to work following the revocation of his accommodation.

196. Arconic terminated Mr. Davis's employment on May 18, 2021.

197. Arconic refused to reasonably accommodate the religious beliefs of Mr. Davis by requiring that he work on the Sabbath.

198. Mr. Davis was denied a reasonable accommodation of his religious beliefs and discharged by Arconic due to his religious beliefs.

199. The unlawful employment practices complained of above were intentional.

200. The unlawful employment practices complained of above were done with malice or with reckless indifference to the federally protected rights of Mr. Davis.

201. Based on the allegations herein, Mr. Davis was discriminated against by Arconic.

202. As a direct and proximate result of Arconic's unlawful, discriminatory, and harassing conduct against Mr. Davis, and as a direct and proximate result of the violations of Mr. Davis's federally and state protected rights, Mr. Davis has suffered harm, including but not limited to lost wages, benefits, and damage to his reputation, and emotional distress.

203. Because of this harm, Mr. Davis is entitled to damages from Arconic.

<u>Count Six</u>

<u>Religious Retaliation Under THRA</u>

204.    Mr. Davis incorporates and re-alleges the foregoing allegations as if fully set forth herein.

205.    Mr. Davis is a member of a protected class via religion. Specifically, Mr. Davis is a member of the Living Church of God.

206.    Mr. Davis engaged in a protected activity, including that he objected to being discriminated against due to his religion, opposed unlawful practices of Arconic, and requested a reasonable accommodation in light of his sincerely held religious beliefs.

207.    Arconic was aware of Mr. Davis's protected activities.

208.    Arconic, through its agents, representatives, and employees, intentionally, willfully, and knowingly took adverse action or created a hostile work environment due to Mr. Davis engaging in protected activities (protesting and opposing unlawful practices) which affected the terms and conditions of Mr. Davis's employment in violation of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-401, et. seq.

209.    Arconic through its agents, representatives, and employees, engaged in actions and omissions constituting retaliation in violation of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-401, et. seq.

210.    Arconic took adverse actions against Mr. Davis by terminating him due to his opposition of a practice made unlawful under the THRA and engaged in activity protected by the THRA, such that a reasonable employee would have found the actions materially adverse, and which would dissuade a reasonable employee from making such an accommodation request to upper management, home office, or human resources at Arconic.

211. There was a causal connection between the exercise by Mr. Davis of such rights and protected activity and the adverse actions against him.

212. As a direct and proximate result of Arconic's unlawful retaliatory conduct against Mr. Davis, and as a direct and proximate result of the violations of Mr. Davis's federally and state protected rights, Mr. Davis has suffered harm, including but not limited to lost wages, benefits, and damage to his reputation, and emotional distress.

213. Because of this harm, Mr. Davis is entitled to damages from Arconic.

<u>Count Seven</u>

Gender Discrimination Under THRA

214. Mr. Davis incorporates and re-alleges the foregoing allegations as if fully set forth herein.

215. Mr. Davis is a member of a protected class via sex/gender.

216. Mr. Davis suffered an adverse employment action by not being allowed to transfer departments and, subsequently, being terminated by Arconic.

217. Mr. Davis was qualified for his position as he had worked for Arconic, or its predecessor, for the last fifteen (15) years and is generally regarded as an exceptional employee.

218. Arconic treated Mr. Davis differently from similarly situated individuals outside of his protected class by treating him differently than Arconic treated a female who also requested for a transfer within one (1) year of being in a department.

219. Specifically, the female was allowed to transfer within the one (1) year "prohibited" transfer period, however, Mr. Davis was not allowed a similar transfer.

220. Based on the allegations herein, Mr. Davis was discriminated against by Arconic.

221. Because Mr. Davis was discriminated against, he is entitled to damages from Arconic.

## Count Eight

## Race Discrimination Under THRA

222. Mr. Davis incorporates and re-alleges the foregoing allegations as if fully set forth herein.

223. Mr. Davis is a member of a protected class via race.

224. Mr. Davis suffered an adverse employment action by not being allowed to transfer departments and, subsequently, being terminated by Arconic.

225. Mr. Davis was qualified for his position as he had worked for Arconic, or its predecessor, for the last fifteen (15) years and is generally regarded as an exceptional employee.

226. Arconic treated Mr. Davis differently from similarly situated individuals outside of his protected class by treating him differently than Arconic treated a minority who also requested for a transfer within one (1) year of being in a department.

227. Specifically, the black minority was allowed to transfer within the one (1) year "prohibited" transfer period, however, Mr. Davis was not allowed a similar transfer.

228. Based on the allegations herein, Mr. Davis was discriminated against by Arconic.

229. Because Mr. Davis was discriminated against, he is entitled to damages from Arconic.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Davis prays as follows:

A.     For the Court to assume and continue jurisdiction of this action;

B.     That a jury be empaneled;

C.     For a permanent injunction enjoining Arconic and its officials, officers, agents, managers, employees, and representatives from engaging in the unlawful practices and acts described herein;

D.     For an award of actual, compensatory, consequential, incidental, pecuniary, and other damages according to proof, including, but not limited to, loss of pay; loss of benefits; loss of an amicable working environment; loss of career and professional opportunities; payment of attorneys' fees and legal costs; harm to his professional reputations; and humiliation, degradation, embarrassment, and severe emotional suffering and distress, in an amount not less than $2,500,000.00;

E.     For an award of punitive damages in an amount not less than $1,000,000.00;

F.     For an award of pre- and post-judgment interest, reasonable attorneys' fees, expert witness fees, and costs;

G.     For other appropriate legal, equitable, and further relief which the Court deems just and proper.

RESPECTFULLY SUBMITTED this 8th day of March, 2022.

HAGOOD MOODY HODGE PLC

*/s/ Jordan T. Newport*
Jordan T. Newport, BPR #037604
900 S. Gay Street, Suite 2100
Knoxville, TN  37902
P: (865) 525-7313
jnewport@hagoodmoodyhodge.com
*Attorney for Plaintiff*